## J. M. WALKER v. BROWNSVILLE COTTON OIL & ICE CO.

Western Section.　July 31, 1926.

Petition for Certiorari denied by Supreme Court January 29, 1927.

1. **Contracts. Letters may Constitute a written contract.**
In an action to recover on a contract employing plaintiff to sell real estate, letters written by the parties held to constitute a contract.

2. **Contracts. Contract to pay real estate commission without giving any time for the sale, held to be an irrevocable contract.**
Where a party entered into a contract with another to sell his real estate, agreeing to pay a certain commission if the real estate was sold to certain interests and no date for the making of the sale was given, held that the contract was irrevocable and if the property was sold to the interests named, at any time, the defendant would be liable for the commission.

3. **Principal and agent. Corporations. A member of a board of directors cannot act as agent for another party whose interest is adverse to the corporation.**
In an action to recover commission for the sale of real estate where the evidence showed that the plaintiff, a member of a Board of Directors of a certain corporation which was interested with other corporations, in the purchase of real estate, entered into a contract with defendant to sell his real estate to the corporations held that the contract was invalid and uninforceable because plaintiff, being a member of the Board of Directors of one of the corporations, could not legally become agent for a party whose interests were adverse to those of the corporations.

4. **Brokers. Realtor's Acts of 1919 and 1921 do not apply to party making a single sale.**
In an action to recover a commission for selling real estate where the defense was that the contract was void because the plaintiff had not complied with Realtor's acts of 1919 and 1921, held that the Acts do not apply to a case of a single transaction and a party may recover a commission where the sale made is a single transaction and he is not holding out or purporting to be a real estate agent.

Appeal from Chancery Court, of Shelby County; Hon. Wightman Hughes, Chancellor.

Reversed.

Holmes & Canale, of Memphis, for appellant.

Burch, Minor & McKay, of Memphis, for appellee.

SENTER, J. The original bill filed in this cause seeks a recovery against the estate of R. N. Bond and the Brownsville Cotton Oil & Ice Company, located at Brownsville, Tennessee, for the sum of $6400 with interest, which amount complainant claims is due and owing to him under a certain contract of employment entered into between complainant and R. N. Bond, as an individual and in his capacity as President of the Brownsville Cotton Oil & Ice Company. It is alleged in the original bill that complainant undertook and

rendered certain services to the defendants R. N. Bond and the Brownsville Cotton Oil & Ice Company in the sale of the electric light and power plant of said defendants located at Brownsville, Tennessee, in the event the sale was made to Mr. T. H. Tutwiler, representing certain associated interests. The defendants denied liability on the ground that complainant did not render any service to defendants in procuring the sale of the property; that complainant was himself connected with the interests that complainant undertook to sell the property to; and because the complainant could not maintain this action because he had failed to qualify as a real estate agent, or broker, or dealer, under the General Revenue Law of 1923, and especially under the provisions of the Realtors Act of 1919, Chapter 182, and under the provisions of Chapter 98 of the Acts of 1921.

By stipulation of parties the case was tried before the Chancellor on oral evidence without a jury. The Chancellor sustained the bill and decreed a judgment in favor of complainant and against the defendants Brownsville Cotton Oil & Ice Company and the Bank of Commerce & Trust Company, administrator of the estate of R. N. Bond, deceased, for the sum of $6,640, with interest from the date of the decree and the costs of the cause. A motion for a new trial was made by defendants, which motion was by the court overruled and disallowed, and the case is now in this court on appeal from the decree of the Chancellor. Several errors have been assigned by appellants, but they may be reduced to three questions of law and fact presented on the appeal for the determination of this court.

It is contended for appellants, (a) that the complainant is not entitled to recover against the defendants, or either of them, because complainant was not so situated as to render any real service to the defendants, and that the alleged contract sued upon was non-enforcible because of a conflict of interests represented by the complainant, in that, at the time the alleged contract of employment was entered into the complainant was a Director in the Memphis Street Railway Company, which company is alleged to have been one of the associated or affiliated corporations which purchased the property, and that complainant could not, therefore, consistently and legally represent as agent the defendants in making a sale of this property to the purchaser because of his official connection as a Director in one of the affiliated companies associated and connected with the purchasing company. And, (b) because complainant had not paid the privilege license required to comply with the provisions of the Realtor's Acts of 1919, and of 1921.

Before entering upon a discussion of the question above set forth we deem it proper to give a summary of the transaction between the

parties as disclosed by the record and the finding of facts by the Chancellor.

The Brownsville Cotton Oil & Ice Company was a corporation with its situs at Brownsville, Tennessee, where it operated a lighting plant, under a franchise from the city of Brownsville, and in connection with that business it also operated a cotton oil plant and an ice plant. It appears that R. N. Bond owned the major portion of the stock of this corporation. The beginning of the negotiations out of which this litigation arose was a letter written by complainant on March 13, 1924, as follows:

"Mr. R. N. Bond,

"Brownsville, Tenn.

"Dear friend:

"I have a matter I would like to talk to you about. Would like for you to telephone me the next time you are in Memphis so that I may have a talk with you.

"With kindest regards to yourself and family, I am,

"Yours very truly."

Shortly after the receipt of this letter Mr. R. N. Bond (who died before this suit was tried, and the suit revived against the administrator) went to Memphis and had a conference with complainant Walker. It developed that the matter which Mr. Walker desired to discuss with Mr. Bond was with reference to the sale of the Brownsville Cotton Oil & Ice Company plant to certain interests represented by Mr. T. H. Tutwiler, and to acquaint Mr. Bond with the fact that a group of interests represented by Mr. Tutwiler was buying the municipal lighting plants in West Tennessee, Eastern Arkansas and Northern Mississippi. It does not definitely appear that Mr. Walker disclosed to Mr. Bond in that conversation just what corporation or corporations Mr. Tutwiler was representing. It also appears that Mr. Walker discussed with Mr. Bond in that conference a separate sale of the cotton oil plant and the ice plant from the lighting plant. The details of the conversation between Mr. Walker and Mr. Bond on the occasion of the first conference is not shown by the record. Mr. Walker stated in his examination in chief substance, that about the middle of March, 1924, in response to his letter of March 13th, that Mr. Bond came to his office in Memphis, and that he then told Mr. Bond, "about the utilities being purchased around in this vicinity, and advised him to get into communication with Mr. Tutwiler and Mr. Tutwiler's affiliated companies. Mr. Bond told me that he also had a gin and cotton oil mill he wanted to dispose of; in fact, he wanted to sell all of those properties together, if he could. I told him that Mr. L. P. Brown. a friend of mine, had been purchasing gin and oil mills in various cities surrounding Memphis, and that I thought, if he would talk

with Mr. Brown, it might be possible that he could effect a sale of those properties with Mr. Brown. We talked at length regarding this, and Mr. Bond said to me then, why can't you handle this matter for me? You know Mr. Brown, and you are familiar with the other details." It appears that shortly after this conversation in Memphis Mr. Walker went to Brownsville to see Mr. Bond and to look over the property, and on one visit it appears that he took an engineer with him to make a general survey of the property. He also wrote Mr. Bond a letter several weeks later dated May 6, 1924, as follows:

"Mr. R. N. Bond,
"Brownsville, Tenn.,
"Dear Mr. Bond:
"Would like to have the drawings and data on your properties there not later than Friday of this week as I want to formally present the matter to the people that I hope to interest here.

"As I told yon in my office some time ago I am trying to interest Mr. Palmer Brown in the oil Mill and gin and Mr. T. H. Tutwiler in the other utilities.

"In your letter let me know just what you can deliver the respective properties clear of encumbrance for.

"As requested by you I have not mentioned our negotiations with anyone except the parties interested."

On May 7, Mr. Bond, in reply to the above letter wrote Mr. Walker as follows:

"Mr. J. M. Walker,
"Memphis, Tennessee.
"Dear Sir:
"When I had my last talk with you it seemed that Brown was not very much interested in the mill, as you told me he said he could handle it only on a junk basis, and since then I am figuring with some other parties, and just at this time I am not in position to make you an offer of any kind. I will try to see you some time next week."

It appears that on May 10th, Mr. Bond was again in Memphis and called on Mr. Walker and in the conversation discussed the matter of a sale of the property with Mr. Walker. Mr. Walker in that conversation told Mr. Bond that he was very busy with his own affairs, and did not have the time to devote to the sale of this property for Mr. Bond, but he states that Mr. Bond insisted on his handling the matter for him, and stated that he expected to compensate him for his time and trouble. This conference resulted in the

letter or instrument made the basis of the contract sued on in this
case.   The letter was dictated by Mr. Walker, and is as follows:

"Memphis. Tenn.,
"May 10, 1924.

"Mr. J. M. Walker,
"O. K. Building,
"Memphis, Tenn.
"Dear Sir:
"This will authorize you to act as my agent in the negotia-
tions with Mr. T. H. Tutwiler relative to the sale of the prop-
erty interests I represent at Brownsville, Tennessee.
"I will expect, however, that you refer any bids you may
receive on the properties to me for acceptance or rejection.
"In lieu of the services you have rendered and may render,
should the properties or any part of them be sold to Mr. Tut-
wiler or his associates either by you, myself or any agent, I
agree to pay you in cash a commission of four per cent on the
gross sale.

"Yours very truly,
"R. N. Bond."

After this conference resulting in Mr. Bond signing the foregoing
agreement, Mr. Walker appears to have had numerous conferences
and talks with Mr. Tutwiler, with reference to the sale of the utili-
ties portion of the plant, and with Mr. Brown with reference to
the sale of the cotton oil plant and gin.   It appears that the only
offer that Mr. Walker procured from Mr. Tutwiler and communi-
cated to Mr. Bond was $125,000 for the lighting plant.   This offer
was not accepted by Mr. Bond, and it appears that Mr. Bond then
gave an option to a Mr. Byrd, representing the Kentucky-Tennessee
Power Company, for $150,000 for the lighting plant, this being a
ninety days' option.   On January 5, 1925, it appears that Mr. Bond
wrote a letter to Mr. Walker seeking to cancel the agreement to pay
to Mr. Walker four per cent commission for the sale of the light
plant.   This letter being as follows:

"Mr. J. M. Walker,
"Memphis, Tennessee.
"Dear Jim:
"Some time ago I made a contract with you to allow you
four per cent on the sale of our light plant at Brownsville, on
the condition that this light plant was sold to Mr. Tutwiler or
his associates.   As there was no time limit on this contract I
wish you would, hereby, cancel same and I take this means of

notifying you that this contract between us on the light plant at Brownsville, is, hereby, cancelled.

"With kindest regards, I am,

"Yours very truly,

"BROWNSVILLE COTTON OIL & ICE CO.,

"By R. N. Bond."

It appears that this letter was written after the option given by Mr. Bond to Byrd had expired. On January 9th, Mr. Walker acknowledged the receipt of the foregoing letter, and wrote Mr. Bond as follows:

"Mr. R. N. Bond,

"Brownsville Cotton Oil & Ice Co.,

"Brownsville, Tenn.

"Dear Bob:

"Am in receipt of your letter of January 6 in which you state you would like to cancel the contract made with me some time ago relative to the sale of the Brownsville utilities.

"When you are in Memphis would like to talk to you regard the sale of these properties. The people with whom I have been negotiating are still interested in the purchase of the properties.

"Hoping I may be able to see you before the 13th of this month, at which time I am leaving for a three or four weeks trip, and with kindest regards, I am,

"Yours very truly,"

Mr. Bond replied to this letter on January 10th, stating: "I am in receipt of your letter of January 9 and note that you are going to leave Memphis on the 13th. I am expecting some company Monday, if they come I cannot be in Memphis, but if they do not I will be there Monday."

So far as the record discloses Mr. Bond did not have any further communication either by letter or by conferences until June 29, 1925, when Mr. Walker wrote Mr. Bond as follows:

"Mr. R. N. Bond,

"Brownsville, Tenn.

"Dear Sir:

"It is my understanding that the deal involving the Brownsville utilities has been closed. In compliance with our agreement, I want to ask that you mail me a check for my commission in this transaction.

"Thanking you for your attention to this matter, I am,

"Yours very truly,"

On July 1, 1925, Mr. Bond replied to the above letter as follows:

"Mr. J. M. Walker,

"Memphis, Tenn.

"Dear Jim.:

"Your letter received and in reply will say that I do not owe you any commission on sale of property. I wrote you some time ago cancelling the agreement we had and received a letter in reply from you.

"With kindest regards, I am,

"Yours very truly,"

In reply to the above letter, Mr. Walker on July 2, 1925, wrote Mr. Bond as follows:

"Am in receipt of your letter of July 1. The negotiations in the sale of the Brownsville property were started by me through Mr. Tutwiler's office.

"You will remember I took an engineer to Brownsville, went over the properties there and later submitted a very detailed report to Mr. Tutwiler and his associates. It was about that time that you entered into a contract with me whereby you were to pay me four per cent on the gross sale of this property, provided it was sold at any time through any agency to Mr. Tutwiler or any of the companies affiliated with his. I will therefore expect you to pay me four per cent of the gross sale of the properties."

Mr. Bond replied to the above letter as follows:

"Your letter received and in reply will say that I cancelled the contract with you four or five months ago, and you know that you have no claim on me for commission for the sale of the light or ice plants, and I am surprised that you have even written me claiming that you have."

The Brownsville Cotton Oil & Ice Company sold the lighting plant to the Tutwiler interests on the ——— day of May, 1925, for $160,000. After this controversy arose between complainant and defendants with reference to the commissions on the sale, and after the suit had been filed attaching the funds and enjoining the paying out of the funds, the parties by stipulation agreed that all of the funds representing the sale price be released for distribution among the stockholders, except $7,000 to be retained in the Bank until this controversy was settled, and to be subject to any judgment or decree of the court in the cause.

We are of the opinion that the agreement of May 10, 1924, if valid and enforcible when made, was not subject to cancellation by defendants except by mutual consent of the parties in the event the property was ultimately sold to the Tutwiler group of interests as provided in the written agreement. Under the provisions of the contract complainant was to receive the four per cent commissions

on the gross sale price in the event the property was sold to Tutwiler or his associates, and the commissions on the sale were to be paid to complainant in the event the property was sold to the Tutwiler interests by complainant, or by R. N. Bond or any other agent. If this property had been sold to any other purchaser, or to any purchaser with whom Mr. Tutwiler was not connected or associated Walker would have had no claim for commissions. There was no time limit stated in the contract for the payment of the commissions, or as to when the sale would be effected. Hence, unless the contract was void for one or more of the reasons above set forth, we think it was clearly enforcible, and complainant would be entitled to recover of defendants the amount of commission stipulated in the agreement. It therefore becomes important that we review the evidence in the record first with a view of determining whether or not the contract was valid and enforcible at the time it was made, or at the time of the sale of the property. We think it well settled that it is contrary to public policy for an officer or a director of the corporation to enter into a contract with a third person whereby for a valuable consideration such officer or director in a corporation agrees to act as the agent of such third person in the sale of the property of the third person to a corporation in which he is an officer or director.

In Vol. 4, sec. 2310, Fletcher's Corp., the rule is thus stated:

"A contract between an officer of a corporation and a third person is contrary to public policy, and therefore illegal and void, where it contemplates a fraud upon a corporation, or where, by giving the officer a secret profit or personal advantage or otherwise, it places his private interests in conflict with his duty to the corporation. Such a contract, therefore, cannot be enforced by either party."

Numerous cases are cited in support of the above rule. There is no fraud alleged or shown upon the part of the parties in the instant case, but there was personal profit, or advantage, which placed the private interests of Mr. Walker as the agent of the seller in conflict with his duty to the corporation as a director, provided, Mr. Walker, under the facts disclosed by the record, sustained a fiduciary relation to the proposed purchaser.

Mr. Walker was a director of the Memphis Street Railway Company, and the first question to be determined is, what relation, if any, did the Memphis Street Railway Company sustain to the corporation or group of corporations that acquired ownership of this property, and if it was one of the associated or affiliated interests represented by Mr. Tutwiler in the purchase of the property. On this question the record is not entirely clear. Mr. Tutwiler, who it appears from the record, was present at the trial of the case, was not called as a

witness. He could have, no doubt, thrown much light on the question. In order to entitle complainant to a recovery it became necessary that complainant prove that this property was ultimately sold to Mr. Tutwiler or to his associates. Complainant Walker, as a witness in his own behalf, was examined on this subject, but his evidence does not definitely disclose just what interest Mr. Tutwiler represented, or what corporation or corporations were associated with Mr. Tutwiler in acquiring this property. His evidence will be later referred to. The most satisfactory evidence in the record on this subject is that of Col. Roane Waring, of the law firm of Miles, Waring & Walker, and we quote from his evidence as follows:

"Q. During the years 1924 and 1925 did you represent, or did your firm represent the utilities who were acquiring public utilities in towns adjacent to Memphis? A. Yes, sir.

"Q. Was one of those companies the National Power & Light Company? A. I couldn't say that the title to any property was acquired in the name of the National Power & Light Co. itself. The National Power & Light Co., as I understand it, is a holding company that owns stock in the Memphis Power & Light Co., for instance, and a number of other public utilities.

"Q. And the same is true, or what are the facts with reference to the Electric Power & Light Co. A. The Electric Power & Light Co. was not organized in 1924. It has since been organized and is a similar company to the National Power & Light Co.

"Q. Now who was the active management of the Memphis Power & Light Co.? A. The President of the company is Mr. T. H. Tutwiler.

"Q. Of this city? A. Yes, sir.

"Q. The Electric Bond & Share Co., what connection did it have with the National Power & Light Co. and the Electric Power & Light Co. and the Memphis Power & Light Co. A. The Electric Bond & Share Co., as I understand, it, Mr. Holmes, speaking a good deal from general knowledge, or hearsay, in a way, is a parent corporation and is interested in both the National Power & Light Co. and the Electric Power & Light Co. The National Power & Light Co., in turn, is interested in the Memphis Power & Light Co., which is an operating company.

"Q. In other words, the local operating company is the Memphis Power & Light Co? A. Yes.

"Q. Is Mr. Tutwiler associated with those companies, or was he associated with them in 1924 and 1925? A. He was President of the Memphis Power & Light Co. and still is, and he was President of the Memphis Street Railway Co. and still is, and those companies are, in turn, connected with, I understand, the National Power & Light Co.

"Q. Was Mr. Tutwiler active in enabling any or all of these companies to acquire utilities in the Memphis territory? A. Yes, I think Mr. Tutwiler was active and instrumental in the acquisition of a number of properties in this territory that sooner or later became connected with the Electric Power & Light Co. or some of them, with the National Power & Light Co. Mr. Tutwiler is not an officer as I understand it, nor is he directly employed by any of the other companies other than the Memphis Power & Light Co. and the Memphis Street Railway Co.

"Q. He was, however, associated with all of them? A. Yes, in the general management of the business."

Later, in his evidence, Mr. Waring was asked and stated as follows:

"Q. Col. Waring, your clients who later bought this property had not then bought the property? A. When the franchise was passed?

"Q. Yes. A. No.

"Q. You know who was insisting that that matter (referring to the Brownsville franchise) be referred to your office, so that it might be satisfactory to the clients that you were representing? A. I think our clients did, probably Mr. Simonds, who is the representative of the National Power & Light Co. and Electric Bond and Share Co., and more or less was in charge of these negotiations."

It appears that in closing the transaction, by which the affiliated interests referred to in Mr. Waring's evidence, ultimately acquiring the ownership of this property that the deed was executed by the officers of the Brownsville Cotton Oil & Ice Company conveying the property to Frank A. Reed, Trustee, and to his successor or successors. It does not appear from the conveyance who Frank A. Reed was Trustee for in this conveyance, and if subsequent deeds were executed by Frank A. Reed, Trustee, by which the title to this property was ultimately vested in the associated or affiliated interests referred to by Mr. Waring, they are not contained in the transcript of the record. However, Mr. Waring was a member of the law firm of Miles, Waring & Walker, of Memphis, that represented the purchasers of this property, and this law firm appears to have been the attorneys representing the purchasers of not only the Brownsville lighting plant, but of numerous other lighting plants in the Memphis territory.

We think it clear from the evidence of Mr. Waring on the subject, that the Memphis Street Railway Company had the same connection with the National Power & Light Company that the Memphis Power & Light Company had with the National Power & Light Company. Mr. Walker was not a director of the Memphis Power & Light Company, nor does it appear that he was a director or officer in the National Power & Light Company; nor does it appear that

he was an officer or director in the Electric Bond & Share Company, but he was a director in the Memphis Street Railway Company. It appears from the evidence of Mr. Waring that the Electric Bond & Share Company occupied the position of "parent corporation," and that the National Power & Light Company was a "holding" company, which in turn held stock in the Memphis Power & Light Company and in the Memphis Street Railway Company, which last two mentioned are operating companies.

Mr. Walker was asked and stated as follows:

"Q. Mr. Walker, what companies are these affiliated companies, represented by Tutwiler, referred to in the record as Mr. Tutwilers companies? A. There are probably a dozen of those companies.

"Q. Can you name some of them? A. No, I cannot.

"Q. Well, the National Power & Light Co? A. That is one of them.

"Q. And the Electric Light —? A. (Interrupting) Electric Bond & Share Co. is the parent company parent organization.

"Q. There is the local company, the Memphis Power & Light Co? A. Yes, sir.

"Q. And the Memphis Street Railway Co. is part of the same? A. Yes."

When asked the question as to whom Mr. Bond referred to in connection with Mr. Tutwiler and his associates, he answered: "Primarily to the Electric Bond & Share Co. and the other companies associated with that organization."

Mr. Walker had previously stated in his examination in chief that the National Power & Light Company and the Electric Power & Light Company and the Memphis Power & Light Company were among the associated or affiliated companies represented by Mr. Tutwiler in negotiating the purchase of this property, and it was on cross-examination that he stated that the Memphis Street Railway Company, of which Mr. Tutwiler was President, was also included in the associated or affiliated companies. The original bill of complainant alleged that the property of the Brownsville Cotton Oil & Ice Company was sold to said Frank A. Reed, agent, representing the National Power & Light Company, and the original bill also alleges that at the time the contract was entered into, T. H. Tutwiler was the President of the Memphis Street Railway Company and the Memphis Power & Light Company, "and associated through subsidiary ownership, holding companies, and in other active ways, with the public utility companies located in numerous cities throughout the entire south."

It appears that Mr. Walker initiated the matter of interesting Mr. Bond in the sale of this property by writing him the first letter in which he stated in substance that he had a matter about which he

desired to talk to Mr. Bond, and invited him to call on him the first time he was in Memphis. Mr. Walker states that his reason for writing Mr. Bond this first letter was that he had knowledge of a number of utility purchasers in the territory, and that he wanted to acquaint Mr. Bond as his friend, with the information he had regarding these utilities being purchased, and he then says: "and I further wanted my friend, Mr. Tutwiler, and his associates, to have an opportunity to bid on these utilities." On this subject we quote from his evidence:

"Q. What was your purpose in writing that letter? A. My—I had information, Mr. Holmes, that I thought would be valuable to Mr. Bond, in that I knew these utilities were being bought, and I knew also that there were a number of companies in the field bidding on these utilities, and my purpose was to befriend Mr. Tutwiler and his associates and Mr. Bond also, by getting them together in the negotiations. I wrote several other letters; I wrote a letter to Mr. Guy Walker, of Covington, who is interested in the utilities there, and also—on the same date as Mr. Bond, and also to Ripley; I wrote several letters that day.

"Q. Were you trying to get employment, Mr. Walker? A. Absolutely not. I was just doing for a friend what I thought either of them would have done for me; having knowledge of the things that I thought were going to happen, I was just conveying that knowledge to my friends.

"Q. Well, did you seek any employment from Mr. Bond at all in this matter? A. Not at all.

"Q. Why did you finally accept employment, Mr. Walker? A. At the instance of Mr. Bond, I agreed to handle the matter for him."

Referring again to the evidence of Col. Waring, it appears that the interests represented by Mr. Tutwiler in procuring the Brownsville Plant, were also interested in the purchase of other electric light plants in the cities and towns adjacent to Memphis. It also appears from Mr. Waring's evidence that he, at least, regarded Mr. Walker as being interested in the purchase of other plants in the Memphis territory by Mr. Tutwiler and the associated or affiliated companies for which Mr. Tutwiler was acting. On page 78 of the transcript of the record Col. Waring states: "I was communicated with from New York by letter, urging us to take some active steps about the Brownsville and some other properties. Among those were the towns of Covington, Dyersburg, and Ripley properties. Mr. Walker—I called him on the phone and asked him if he would go with me to Covington. It was thought that he could help us some with the Covington negotiations." He then stated that Mr. Walker had a cousin who lived in Covington and he thought that Mr. Walker would have some influence with his cousin. He stated, "I concluded to take

Mr. Walker and Mr. Miller, and we went to Covington and Ripley and Dyersburg, about the purchase of the properties there—it was sort of a scouting trip.'' He then stated: ''I asked Mr. Walker to go up there, knowing that he was a friend of Mr. Tutwiler's and interested in the companies.''

Another significant statement is contained in the evidence of Col. Waring. He was asked by Mr. Walker's attorney in his examination in chief:

''Q. Now, Mr. Walker was trying to keep you all interested in the Brownsville properties? A. Well, we didn't need any help in being interested. We were interested all the time. I think he did discuss it. Mr. Walker went with us as far as Dyersburg and when we were at Dyersburg he left us there and came back on the train, and Mr. Miller and I went on to Union City and I had the object the next day or the day after to go to Brownsville to carry out the instructions that I had to keep in touch with the Brownsville situation because we were anxious to acquire it. . . .''

The reference we have hereinbefore made to the evidence and pleadings is a summary of the material evidence bearing upon the question as to whether the Memphis Street Railway Company was included in the group of associated or affiliated interests interested in the purchase of the Brownsville plant. From this evidence we reach the conclusion that Mr. Walker undertook to render assistance to Mr. Bond and the Brownsville Cotton Oil & Ice Company at the solicitation of Mr. Bond. All the material evidence in the record is to the effect that Mr. Bond engaged or sought to engage the assistance and services of Mr. Walker in selling this property to Mr. Tutwiler and those for whom Mr. Tutwiler was acting. We think it is clear from the record that Mr. Bond knew of the intimate personal and business relations existing between Mr. Walker and Mr. Tutwiler, and Mr. Bond was no doubt desirous of procuring Mr. Walker to handle the negotiations for him because he believed Mr. Walker was in a position to be of valuable assistance to him. We are also of the opinion that Mr. Walker undertook to render this service with some reluctance because of his other business interests demanding his time and attention. We are further of the opinion that Mr. Walker invited the conference with Mr. Bond with a view of bringing Mr. Bond and Mr. Tutwiler together, and that in doing so he would be serving the interest of both parties. This was the conclusion reached by the Chancellor as set out in the finding of facts by the Chancellor. The Chancellor, however, did not determine the question with reference to the interest, if any, that the Memphis Street Railway Company had in the purchase of this property, nor did the Chancellor determine what connection, if any, the Memphis Street Railway Company had with the affiliated companies represented by Mr. Tutwiler

in acquiring this property. These, we think, are pertinent questions and determinative of the legal question presented as to whether Mr. Walker sustained such official connection with the purchasers of this property as would preclude him from undertaking to become the agent of third parties in negotiating, or assisting in the negotiation of the sale. If the Memphis Street Railway Company was one of the affiliated companies represented by Mr. Tutwiler in the purchase of this property, Mr. Walker, being a director of the Memphis Street Railway Company, could not, consistent with his duty to the corporation of which he was a director, act as the compensated agent of the sellers of this property. There would be a conflict both of interest and duty. His first duty would be to the corporation of which he was a director, and it would be to the interest of such corporation to acquire the property at the lowest obtainable price. On the other hand, it would be to the interest of the selling company to receive the best obtainable price for its property. The conflict of interests is patent. After a careful review of the record in this case, we cannot escape the conclusion that the Memphis Street Railway Company was one of the associated or affiliated companies represented by Mr. Tutwiler in acquiring this property, and that Mr. Walker being a director of the Memphis Street Railway Company could not, therefore, enter into a contract by the terms of which he became the compensated agent of another corporation dealing with the corporation in which he was a director where there is a conflict of interests involved, as in the present case. Certainly he had a personal interest to subserve in having the Tutwiler group to become the purchasers of this property from defendants. His compensation under the contract was conditioned alone upon the property being sold to Mr. Tutwiler and his associates, and this is within the rule hereinbefore referred to. "It places his private interests in conflict with his duty to the corporation. Such a contract, therefore, cannot be enforced by either party."

While, as above stated, the record is not entirely clear on the question of the interest that the Memphis Street Railway Company had in the purchase of this property, it does appear that the Memphis Street Railway Company was in a sense a subsidiary, or operating company, connected with the National Power & Light Company, which company was in turn connected with the Electric Bond & Share Company, as the parent company. We think that directors of the subsiduary or operating company associated with and connected with a group of companies controlled by a parent corporation, sustains a fiduciary relation which should in equity and all good conscience preclude the director from engaging in any contractual undertaking from which he would derive personal profit in rendering a service to a

third party, which service, in its very nature, contemplates a conflict in interest with the company with which he is officially connected.

We, are therefore of the opinion that the learned Chancellor was in error in not holding that the contract sued on was void and nonenforcible for the reasons above set forth.

The second question presented by the appeal is with reference to the failure of complainant to pay the privilege license as provided for real estate dealers, agents and brokers under the general Revenue Act of 1923. This question, we think, has been decided by the Tennessee Supreme Court adversely to the contention of appellant in several cases. It clearly appears that complainant was not engaged in the real estate business, either as a dealer, agent or broker. The complainant was a man of considerable business affairs, and did not hold himself out as a real estate agent, and it is clear from the record that this is the only real estate transaction in which he assumed to act as an agent in selling property or in assisting in the sale of the property. While it is true the Brownsville Cotton Oil & Ice Company operated a cotton oil mill and gin in connection with the lighting plant, and the property was separately sold, yet it was a single transaction insofar as complainant's agreement was concerned. Trentham v. Moore, 111 Tenn., 346; 116 Tenn., 108; Winder v. Lobertini, 151 477. In the Winder case the court says: "It is well settled that a single isolated transaction does not call for the payment of the tax, but is evidential only of facts tending to establish a presumption, under some circumstances conclusive, that the business is being engaged in and the privilege being exercised."

Without reviewing the decisions in this State on this subject, we are of the opinion that the complainant, under the facts of this case, and under the decisions by our Supreme Court, was not subject to the payment of the privilege tax provided by the general Revenue Act of 1923.

The third contention made for appellant is that complainant had not complied with the Realtor's Acts of 1919 and 1921. Chapter 98 of the Acts of 1921, and Section 3 thereof, is especially invoked by appellant. Section 3 of Chapter 98 of the Acts of 1921 is as follows:

"Sec. 3. Be it further enacted, that one act for a compensation or valuable consideration of buying or selling real estate of or for another, or offering for another to buy or sell or exchange real estate or leasing or renting or offering to rent real estate, except as herein specifically excepted, shall constitute the person, firm, partnership, association, co-partnership or corporation performing, offering or attempting to perform, any of the acts enumerated herein, a real estate broker, or a real estate salesman within the meaning of this act."

It is contended for appellants that the Realtor's Acts of 1919 and of 1921 had the legislative intent to place the business of realtors and real estate agents and brokers on the plane of other professions, and to regulate the business so as to place it upon a professional basis. We think this is no doubt true, and that the Legislature realized the importance of making adequate provision for the protection of the public against unscrupulous and irresponsible persons engaged in a business wherein advantage can be so readily taken and impositions practiced. However, the case of Winder v. Lobertini, supra, was decided at the September term, 1924, and while it does not appear from the opinion in that case that Section 3 of Chapter 98 of the Acts of 1921 (Realtor's Act) was discussed by the court specifically, yet in that case the court quoted approvingly from the case of Trentham v. Moore, supra, as follows: "The court held the pertinent inquiry to be whether or not the party alleged to be liable for the tax is engaged in the business declared to be a privilege and held, further, that an express provision of the Act, whether they make a business of it or not, is nugatory." The Winder case was predicated upon a contract to pay commissions on a single sale of real estate. It appears in that case, as in the instant case, that it was a single transaction, and to this extent the cases are strictly analagous. The court held the contract valid and enforcible in the Winder case and rendered judgment for the contract price, notwithstanding the privilege tax had not been paid, and so far as the opinion discloses, there had been no compliance or attempted compliance with Chapter 98 of the Acts of 1921. We are of the opinion that this case so recently decided by the Supreme Court is conclusive against the contention of appellant on this question. We are of the opinion that the failure of complainant to pay the privilege tax as provided under the General Revenue Act of 1923; nor the failure of complainant to comply with the Realtor's Acts of 1919 and 1921 would not preclude the complainant from maintaining the suit, and the assignments of error based on these last questions of non-compliance with these Acts are overruled.

For the reasons set forth in this opinion, the assignments of error based upon the decree of the Chancellor in holding that the alleged contract sued on was valid and enforcible, are sustained, and the decree of the Chancellor in decreeing a judgment against the defendants, or either of them, is reversed and the suit is dismissed. Complainant and surety on the appeal bond will pay the costs of this appeal.

Owen and Heiskell, JJ., concur.